## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **AMADO B. RAVELO GUERRERO and MARLENE JÁQUEZ UREÑA individually and on behalf of their minor daughter HRJ**<br><br>**Plantiffs**<br><br>**v.**<br><br>**ERNESTO DI GREGORIO GODOY; VALERIA DI GREGORIO HERNÁNDEZ; ECOLIFT CORPORATION; INTEGRAND ASSURANCE COMPANY; PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; MAPFRE PRAICO INSURANCE COMPANY; A, B, and/or C INSURANCE COMPANIES; INSURANCE COMPANIES F, G, and/or H; JAMES, JANE and JOHNSON DOE**<br><br>**Defendants** | **CIVIL NO.**<br><br><br>**DAMAGES**<br>**PLAINTIFFS DEMAND TRIAL BY JURY** |

## COMPLAINT

**TO THE HONORABLE COURT**:

**NOW COME** Plaintiffs **Amado B. Ravelo Guerrero**, **Marlene Jáquez Ureña**, and **HRJ** (minor), represented by the undersigned attorney and most respectfully state, allege and pray as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff Amado B. Ravelo Guerrero (subsequently, Amado Ravelo) and Plaintiff Marlene Jáquez Ureña (subsequently, Marlene Jáquez), father and mother, respectively, to Plaintiff HRJ (minor), hereby bring this action under Puerto Rico local tort law, 31 L.P.R.A. § 5141 et. seq., seeking compensatory damages to redress the physical and emotional damages suffered by HRJ and themselves due to the exclusive and inexcusable crass negligence of the codefendants.

2.     As a direct consequence of the acts and/or omissions set forth herein, plaintiffs have suffered and continue to suffer severe emotional damages which include, but are not limited to, pain and suffering, emotional distress, and mental duress, in addition to the physical hardships suffered by HRJ.

3.     HRJ underwent a terrible car crash on Wednesday, June 26, 2013, while traveling in a car driven by codefendant Valeria Di Gregorio Hernández (subsequently, Valeria Di Gregorio).  Said car was property of codefendant Ecolift Corporation, a company owned by codefendant Ernesto Di Gregorio Godoy (subsequently, Ernesto Di Gregorio).  Ernesto Di Gregorio authorized his then minor daughter's use of the car on the night of the accident.

4.     Codefendant Puerto Rico Highways and Transportation Authority had jurisdiction over PR-20 and the exit (South to North) towards Acuarela Street at the time relevant to the facts of the case and, as such, had the duty to maintain said highway and exit, as well as the responsibility of making sure that both complied with applicable highway safety guidelines.

## JURISDICTION AND VENUE

5.     The United States District Court for the District of Puerto Rico has jurisdiction over this action under 28 U.S.C. § 1332 since the matter in controversy exceeds the sum of **seventy five thousand dollars ($75,000.00)**, exclusive of interests and costs, and is between citizens of different states.

6.     Plaintiffs are citizens of and domiciled in the state of Louisiana.  Marlene Jáquez and Amado Ravelo established their domicile in Baton Rouge, Louisiana on September, 2014, and plaintiff HRJ attends college in said state since August, 2013.

7.     All defendants are either individuals who reside in Puerto Rico or legal entities or corporations domiciled, incorporated and/or which have their principal place of business in Puerto Rico.

8.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in the District of Puerto Rico because the events that justify the causes of action occurred in this district.

## PARTIES

**Plaintiffs**

9.     **HRJ**, a minor child born on September 1995, is a citizen of the United States, domiciled and a resident of the state of Louisiana.  She is represented in this action by her parents, Amado B. Ravelo and Marlene Jáquez.

10.    **Amado B. Ravelo Guerrero**, of legal age, is a citizen of the United States, domiciled and a resident of the state of Louisiana.  He is the father with *patriae potestas* of HRJ.

11.    **Marlene Jáquez Ureña**, of legal age, is a citizen of the United States, domiciled and a resident of the state of Louisiana.  She is the mother with *patriae potestas* of HRJ.

**Defendants**

12.    **Valeria Di Gregorio Hernández**, of legal age, is a citizen of the United States, domiciled and a resident of Puerto Rico who was driving the car at the moment of the accident.

13.    **Ernesto Di Gregorio Godoy**, of legal age, is a citizen of the United States, domiciled and a resident of Puerto Rico.  He is the father of Valeria Di Gregorio whom, at the time of the facts relevant to the case, was a minor over whom he had *patriae potestas* and who resided with him.

14.    **Ecolift Corporation** is a corporation created under the laws of Puerto Rico and located in San Juan, Puerto Rico.  Ecolift Corporation owns the car, a Toyota Yaris

2009, license plate no. HKT-776, in which HRJ was riding as a passenger at the time of the accident.  Defendant Ernesto Di Gregorio is the owner of Ecolift Corporation, and he granted his then minor daughter, Valeria Di Gregorio, permission to use said vehicle for activities unrelated to his company's business.

15. **Integrand Assurance Company** is an insurance company created under the laws of Puerto Rico and authorized by the Insurance Commissioner who provides liability coverage for damages caused by the car mentioned in the previous paragraph.  It is located in San Juan, Puerto Rico.

16. **Puerto Rico Highways and Transportation Authority** (subsequently, PRHTA) is a public corporation, created under the laws of Puerto Rico and located in San Juan, Puerto Rico, that has the power to sue and be sued.  On June 26, 2013, PRHTA had jurisdiction over PR-20 and the exit (South to North) towards Acuarela Street and, as such, had the duty to maintain said highway and exit, as well as the responsibility of making sure that both complied with applicable highway safety guidelines.

17. **MAPFRE PRAICO Insurance Company** is an insurance company created under the laws of Puerto Rico and authorized by the Insurance Commissioner who provides liability coverage for damages caused in highway PR-20, where the accident occurred in this case.

18. **A, B and/or C Insurance Companies**, as the insurance companies who, upon information and belief, provide liability coverage for the car, are solidarily liable to plaintiffs for damages caused by the insured car.

19. **Insurance Companies F, G and/or H**, as other insurance companies may provide liability coverage that makes them liable for facts similar to the ones described in this Complaint.

20.   **James, Jane and Johnson Doe** are individuals who may be liable for the occurrence of this accident.

21.   All allegations and causes of action against any defendant should be understood as also made against all other defendants.

### RELEVANT PROCEDURAL FACTS

22.   On June 24, 2014, Plaintiffs filed a *Complaint* before this Court, <u>Amado B. Ravelo, et al. v. Ernesto Di Gregorio, et al</u>, Civil No. 14-01503-SEC.

23.   On said occasion, plaintiffs had filed suit against the following Defendants: Ernesto Di Gregorio, individually and on behalf of his Conjugal Partnership Di Gregorio-Martínez and of his then minor daughter, Valeria Di Gregorio, as well as against Ecolift Corporation.

24.   As per Court's order, plaintiffs filed an *Amended Complaint*.

25.   On August 4th, 2014, defendants filed an *Answer to Amended Complaint*.

26.   On August 13th, 2014, plaintiffs voluntarily dismissed their claims against Michelle Martínez and the Conjugal Partnership Di Gregorio-Martínez.

27.   On August 29, 2015, defendants filed a *Third Party Complaint* against PRHTA and MAPFRE as its insurer.

28.   Third-party defendants filed an *Answer to Third Party Complaint* on November 24, 2014.

29.   Extensive discovery was conducted by way of interrogatories, requests for production of documents and admissions, as well as depositions. These depositions included depositions of plaintiffs taken on December 15 and 17, 2014; depositions of defendants taken on December 19, 2014.

30.     The following year, on July 22, 2015 and August 5, 2015, depositions of officers of PRHTA were taken as part of the discovery process.  Transcripts for both depositions were notified to plaintiffs by email on September 28, 2015.  It was during the deposition of the director of PRHTA's Conservation Office, Mr. Tomás Cotto Medina, that plaintiffs learned that PRHTA had apparently been negligent in maintaining PR-20's exit towards Acuarela Street, and that the markings, channelizing lines and signs announcing the existence of said exit and the speed limit to access it did not comply with the applicable guidelines and regulations.

31.     On October 16th, 2015, third-party defendants filed a *Motion to Dismiss due to Lack of Jurisdiction* on diversity grounds.

32.     In essence, the movants argued that by the time of the filing of the complaint, plaintiffs' domicile was not the State of New Jersey, as stated in paragraph 5 of the *Amended Complaint*, but the Commonwealth of Puerto Rico.

33.     On October 22, 2015, defendants Ernesto Di Gregorio (individually and in representation of minor Valeria Di Gregorio) and Ecolift Corporation filed a *Motion for Joinder as to the Motion to Dismiss filed by the other Defendants*.

34.     Even though it was established by the facts that, before the filing of the Complaint, plaintiffs Marlene Jáquez and HRJ left Puerto Rico with the intention of not returning, the discovery indicated that an argument could have been made to show that they did not establish domicile in the State of New Jersey by the date of the filing of the Complaint, and that their current domicile in the State of Louisiana could not be taken into account, as it was acquired after the filing of the Complaint.  As to the co-plaintiff Amado Ravelo, it could have been argued that he was a resident of New Jersey before the filing of the Complaint, but it was questioned by third party defendants.

35.   On November 13, 2015, plaintiffs filed a *Motion to Dismiss without Prejudice under Rule 41(a)(1)*.

36.   On December 4, 2015 the Court granted plaintiffs' motion and issued its *Judgment* dismissing the case without prejudice.

37.   On December 19, 2015, defendants/third party plaintiffs filed a *Motion Requesting Attorneys' Fees or in the Alternative, to Alter/Amend Judgment to Include Attorneys' Fees*, which was timely opposed by plaintiffs on January 4, 2016, by way of a *Response in Opposition to Motion Requesting Attorneys' Fees or in the Alternative, to Alter/Amend Judgment to Include Attorneys' Fees*.

38.   The Honorable Court denied defendants/third party plaintiffs' motion on June 29, 2016.

## GENERAL FACTUAL ALLEGATIONS

39.   On the evening of Tuesday, June 25, 2013, HRJ and Valeria Di Gregorio (respectively, 17 and 18 years of age at the time of the facts relevant to this case) were at a friend's house in Condado, Puerto Rico with other minors.

40.   Later that night they relocated by car to John Doe's in Guaynabo, a restaurant that serves alcoholic beverages.

41.   Around midnight on Wednesday, June 26, 2013, HRJ and Valeria Di Gregorio, along with MC, HTS, and AOM, also minors, left John Doe's with the intention of going to their respective homes.

42.   The five minors left together in a 2009 Toyota Yaris (hereinafter denominated as the "Yaris", "vehicle" or "car"), license plate number HKT-776.

43.   Said car was property of Ecolift Corporation, a company owned by Valeria Di Gregorio's father, Ernesto Di Gregorio.

44.    It had been raining in the area on the night leading from June 25 to June 26, 2013.

45.    Defendant Valeria Di Gregorio was driving the car with four other minors as passengers, including plaintiff HRJ.

46.    Valeria Di Gregorio had been drinking alcoholic beverages while at John Doe's and earlier that day.

47.    Valeria Di Gregorio's use of the vehicle was allowed by her father, Ernesto Di Gregorio.

48.    At around midnight on June 26, 2013, the five minors in the Yaris were on traveling on the right lane of Martínez Nadal Avenue (Highway PR-20) in Guaynabo, transiting from South to North, km 4.4, according to the Traffic Accident Police Report redacted by Agent Samarie Rosario Zayas, Police Investigator, Badge No. 36030.

49.    According to said Traffic Accident Police Report, Valeria Di Gregorio was driving above the speed limit.

50.    According to HRJ's best recollection, although it had been raining during the night, the road was sufficiently visible.

51.    The car approached the exit to Acuarela Street, which leads to Esmeralda Avenue.

52.    Said exit is divided from Acuarela Street to the right by a concrete barrier on the right, which runs continuously up to that point from PR-20, and divided from PR-20 to the left from that point forward by concrete barrier that begins as a triangular curb.

53.    PRHTA is the entity with jurisdiction over PR-20 and, as such, is in charge of the maintenance of PR-20 and the exit towards Acuarela Street.  Said maintenance includes the marking of the pavement and channelizing lines, the elimination of potholes, the installation of required signs, and the evaluation of areas that were

previously marked or painted and have lost their marks or paint because of the weather or passing of time.

54.   PRHTA keeps statistics of vial safety in highways such as PR-20, which includes information of accidents on various parts of the expressway, including its exits.

55.   PRHTA conducts studies of safety needs and accidents in the roads under its jurisdiction.

56.   The exit of PR-20 towards Acuarela Street, which is located on the left side of the exit, did not have the required channelizing lines to indicate the existence of the upcoming curb to drivers, in violation of regulations.

57.   The exit of PR-20 towards Acuarela Street has concrete barrier that ends in a curb to the right of said exit.  This curb was not painted to indicate its existence to drivers, in violation of regulations.

58.   There were no visible signs advising drivers of the presence of the exit, in violation of regulations.

59.   There were no visible signs announcing the speed at which a car should enter the exit, which is in violation of regulations.

60.   Valeria Di Gregorio, who was driving above the speed limit, claims that, because she did not know the area well she mistakenly took the exit to Acuarela Street.

61.   Apparently, when Valeria Di Gregorio noticed that she had taken the exit, she tried to redirect the car to PR-20.

62.   Next thing HRJ knew, one of the car's front wheels collided with a concrete barrier. At this time, HRJ noticed that AOM had his hands on the wheel of the car. Apparently, AOM tried to redirect the vehicle as to avoid a collision with the barrier that was on the right.

63.    Valeria Di Gregorio lost control of the vehicle, which collided with one of the concrete barriers.

64.    From Valeria Di Gregorio and HRJ's recollections, it is unclear which barrier or curb was hit.

65.    Because of the collision and the speed at which the car was going at the time, the vehicle and its passengers overturned to the left, before finally coming to a stop right side up on another lane of Martínez Nadal Avenue that was approximately 100 feet from the original site of the collision.

66.    Valeria Di Gregorio was the first of the passengers to be able to exit the car; followed by AOM, who helped HRJ to exit the car.

67.    The car's roof was severely damaged.

68.    HRJ was wearing her seatbelt at the time of the accident.

69.    The next thing HRJ recalls is limping from the spot where the car finally stopped, and collapsing on a grassy area that borders PR-20.

70.    The other minors that were in the car with HRJ were very worried about her because she was bleeding profusely from two wounds on her head.

71.    However, the pain from the wounds in her head did not compare to the terrible pain HRJ felt on her back.

72.    After being able to limp to the spot where she collapsed, HRJ could not move her torso again and was only able to move her arms and legs.

73.    She slipped in and out of consciousness and, although she was conscious some of the time, HRJ cannot remember much of what happened between the time when she collapsed on the ground and when an ambulance arrived, approximately 20 minutes later.

74.    The paramedics immobilized HRJ and transferred her to the ambulance.

75.   MC, one of the other minors that were in the car, accompanied HRJ in the ambulance to Centro Médico because she had suffered the second worst injuries after HRJ's.

76.   The other three minors that were in the Yaris, Valeria Di Gregorio, AOM and HTS, were taken to another hospital because they had suffered minor injuries.

77.   While in the ambulance, HRJ was crying hysterically, and the paramedics were trying to calm her down.  She was in a lot of pain and extremely worried about her injuries, since she knew the seriousness of a back injury, fearing that she would never be able to walk again.

78.   MC was able to contact HRJ's parents to inform them of the accident.

79.   Marlene Jáquez and Amado Ravelo were at the house where they lived at the time, which is located in Carolina, Puerto Rico.  They were asleep when, at around 1:00 am on June 26, 2013, they received a telephone call.  Marlene Jáquez quickly picked up the phone, since she knew that her daughter was not home.  She heard a voice of a girl she didn't recognize and who told her that HRJ had been in an accident and that she was hurt, but that everything was alright and that they were on their way to the hospital.  Amado Ravelo, who had also awoken because of the call, was listening to the conversation.  Neither parent knew MC well.  Marlene Jáquez then asked to speak to her daughter.  When MC handed HRJ the phone, Marlene Jáquez heard HRJ crying and she could not understand what her daughter was saying.  Then the call fell through.

80.   Fearing the worst, Marlene Jáquez and Amado Ravelo desperately tried to call the number again, but the call did not go through.  HRJ's parents did not know the severity of their daughter's injuries; where the accident had occurred; or to what hospital she was being taken to.  Knowing that HRJ had been in the Condado

area, they immediately left their home and went to Condado looking for the accident site with the hope that, because it was a weekday and so late at night, they would be able to find police officers and an ambulance, but found neither. They later found a policeman who informed them that there had not been any reports of a traffic accident in Condado, and suggested that they go directly to Centro Médico and check there, which they did.

81.   When HRJ arrived at Centro Médico, her parents, Amado Ravelo and Marlene Jáquez, were waiting for her at the ambulance arrival area.  This was around 2:00 am on June 26, 2013.  Marlene Jáquez and Amado Ravelo had been waiting there for some time, expecting every ambulance that arrived to be the one their daughter was in.  When the ambulance HRJ was riding in arrived and her parents finally saw her, HRJ was crying, wearing a neck brace, and covered in blood.

82.   Upon arrival to the Emergency Room's Trauma Center in Centro Médico, HRJ was accommodated in a hospital bed, and her neck and back were stabilized.  HRJ slipped in and out of consciousness on a few occasions during that time period. She continually complained about the pain in her back.  Plaintiffs Amado Ravelo and Marlene Jáquez were left with HRJ still bleeding in a hospital bed in an aisle full of patients waiting for their turn.

83.   Amado Ravelo and Marlene Jáquez asked if they could transfer their daughter to another hospital, but were told that, because of the Administración de Compensación por Accidentes de Automóviles's (ACAA) rules, other hospitals would not admit trauma patients from Centro Médico until they were discharged. The police agents that had been at the scene of the accident were also present escorting HRJ and to follow up on her injuries, so as to complete the Police Report.

84.    HRJ was to have minor surgery in which the two wounds in her head would be sutured.  Before that, for the approximately four (4) hours HRJ had been at Centro Médico, she had not received any medical attention.   Part of HRJ's hair was shaved in order for the medical staff to be able to suture the wounds on her head. Twenty six (26) sutures were necessary to close one of her wounds.  This was at or around 4:30 am on June 26 2013.   HRJ cried when she saw her hair fall to the floor.

85.    It wasn't until 5:00 am, when her admission paperwork was underway, that the hospital staff learned that HRJ was a minor.   After this, HRJ was taken to the pediatric ward of the Emergency Room at the Trauma Center in Centro Médico. Her parents were with her at all times.

86.    For Marlene Jáquez and Amado Ravelo to be able to get some rest during those hours, they had to sleep on the hospital's floor.   The cold temperatures in the hospital worsened Marlene Jáquez's Systemic Lupus Erythematosus' symptoms which included headaches, pain in her joints, immobility, and allergies.

87.    At 5:47 am on June 26, 2013, an abdominopelvic CT Scan with contrast was performed, which had been ordered by Emergency physician, Dr. Wilfredo Díaz Romero.  The Radiology Report showed, among other things, that HRJ had suffered a "[s]everely comminuted fracture of the L1 vertebral body involving both superior and inferior endplates and extending to the posterior surface, representing a burst fracture with loss of at least 25% vertebral body height."  The Report also noted that there was a "mild to moderate retropulsion of fracture fragments into the spinal canal (at least 7 mm).  Small amount prevertebral compression." A chest CT with intravenous contrast was simultaneously performed, with findings of "right right upper lobe pulmonary parenchymal contusive changes." At 5:36 am a head CT without contrast had been performed, with the following findings: "large

frontoparietal scalp hematoma with skin lacerations and soft tissue emphysema. No skull fractures or acute intracranial pathology."   A neck CT had also been performed, which revealed that there were no acute cervical spine fractures or dislocations.

88.   Also, radiology studies were performed, with findings in the lateral lumbosacral spine studies of "compression fracture in the superior articular facet of L1.  About 25% of anterior height loss", and spine AP lateral studies with similar findings.

89.   In order for the technicians to perform HRJ's imaging and radiology studies, they had to cut off her shirt and bra because she was unable to move her torso. Plaintiffs Amado Ravelo and Marlene Jáquez were informed that HRJ's bruised lungs would heal on their own, but that an MRI would be necessary to figure out the severity of the fracture.

90.   HRJ had a foley catheter installed, as well as an IV line.

91.   During the night of June 27, 2014, after having spent two days in the Trauma Center's Children's Ward, HRJ was transferred to the orthopedic wing of the Adults University Hospital in Centro Médico.  There, HRJ had nurses who administered Morphine and Percocet every 6 hours as management for the patient's back-pain. HRJ spent 5 days in that room in the Adults' University Hospital, without the hospital's personnel being able to perform an MRI due to complications with the MRI equipment.

92.   During those days, plaintiffs met the orthopedic surgeon, Dr. Maisonet who would perform HRJ's surgery; which they were told would most likely be necessary, but that it would finally be determined after an MRI was performed.

93.   An MRI was performed on HRJ on June 28, 2013, and dictated on July 2, 2013.

94.     On the 7th day of HRJ's hospitalization, July 2, 2013, Dr. Maisonet informed Plaintiffs that HRJ had a compression fracture on her Lumbar 1 and that she might need surgery.  More X-Rays were performed, and finally, Plaintiffs were informed that surgery would not be necessary and that, if it were to be performed, it would be a preventive surgery.  That day, HRJ was given a back brace and discharged.

95.     Marlene Jáquez refused to leave her daughter's side and slept on the floor next to her daughter's hospital bed for 7 days.  Amado Ravelo spent his days between the hospital and their house in Carolina, Puerto Rico, where he went to pick up clothes for him and his wife and to sleep, and left quickly to go back to his family's side.

96.     After HRJ was discharged from the hospital and her parents were ready to take her home, she was so afraid of getting into a car again that she started to cry.  Having spent 7 days in a hospital without moving caused HRJ's body to debilitate, leaving her incapacitated to perform daily activities and chores, such as bathing or getting dressed.

97.     After HRJ was discharged, her hair had to be cut very short.  She had not been able to wash it while she was hospitalized because of the bed and the position she needed to be in; because of this, her hair was left with dirt, clotted blood and glass for more than 10 days made it impossible for her to clean it and brush it as it was. HRJ had had long hair since she was 10 years old.  Having to cut it so short was a very difficult experience for her.

98.     When she first got home, she had to go up the stairs of the apartment complex she and her parents lived in.  She realized the difficulties she must face from then on. She used to sleep in a bunk bed, and her father had to switch rooms with her until they were able to buy a new bed for her, because she could no longer get to the top bunk of her bed where she usually slept.  Her father slept in her bed and her

mother stayed with her every night because HRJ had to take medications during the night and needed help taking them.

99.   HRJ had to use diapers for some time because she could not get up to use the bathroom.

100.   The amount of Percocet HRJ was given to reduce her pain paralyzed her intestines and left her unable to defecate for 11 days.  Because of this, HRJ could not be left alone in the house.  This situation caused great stress and anguish to her and her parents.

101.   HRJ was afraid to leave the house because, as a result of the terrible car accident and the ordeal she had to endure, she was afraid to travel in an automobile again.

102.   HRJ had applied and been accepted to Louisiana State University and was, before the accident, very excited to go to the university after her summer vacations.  Because of the injuries suffered, HRJ could not sit still for many hours at a time.  She became depressed and believed she would not be able to attend Louisiana State University because of her injuries, and was forced to withdraw her application.  HRJ attended a psychologist because she felt very sad, angry, and depressed.  This visit made her feel even worse and she did not visit the psychologist again.  HRJ lost 18 pounds after the accident.

103.   During approximately one and a half to two months, Marlene Jáquez had to suspend her career as a Real Estate Agent to take care of her daughter.  She had to help HRJ bathe, change her clothes, get up, sit down, and go to the bathroom.

104.   HRJ's parents accompanied her to all her medical appointments which, to be covered by ACAA, had to be through ACAA's service providers in Puerto Rico.  During their visits to Dr. Maisonet in Centro Médico, Plaintiffs had to arrive at 5 am,

to be finally seen by the doctor at around 9:00-10:00 am because of the many other patients the doctor had to see.

105.  On an appointment with Dr. Maisonet, the doctor instructed HRJ to swim, an exercise that would strengthen her back.  Having a pool in her apartment complex, HRJ quickly started her swimming exercises, which strengthened her back. Swimming was the only activity in which she did not need to wear the back brace.

106.  After getting subsequent x-rays performed, Plaintiffs were told by the x-ray technician that HRJ would never be able to dance again or have children because her back was not strong enough.  The technician also told them that the swimming exercises were not helping. Receiving this information devastated HRJ who cried every day for about 2 weeks because of the news.

107.  Plaintiffs asked for a second opinion, and were informed that the diagnosis the technician had given them was erroneous.  HRJ underwent further radiology studies at the Carolina Imaging Center that consisted of Thoracic AP Lateral and Lumbosacral AP Lateral.  The final report, dictated on August 8, 2013, indicated that the Thoracic Spine Examination established that "[t]he vertebral bodies show evidence of segmentation abnormalities.  The invertebral disc spaces appear to be slightly narrow at the T 12-L1 level with associated wedge fracture of the L1", with "[m]ild dextroscoliosis without evidence of fracture."    The Lumbar Spine Examination's findings showed that there was "normal lordosis with mild kyphosis at the thoracolumbar junction secondary to wedge fracture deformity involving the L1 vertebral body" and "decreased invertebral disc height at the T12-L1 level", among other findings.

108.  On August 15, 2013, almost two months after the accident, HRJ had her final visit with Dr. Maisonet.  During that visit, she was seen by the resident doctors and was

told that she may need surgery after all, and that they did not think she would be able to attend Louisiana State University that year.

109. The news devastated HRJ, who cried inconsolably. She had already said goodbye to all her friends that had left to start their freshmen year in college, leaving her behind; even the ones that had been in the accident with her were doing well and left for school in the continental USA.

110. Marlene Jáquez tried to stay positive for her daughter's benefit, but HRJ could see through it and saw the anguish this information caused her mother.

111. At that time, the medical director of orthopedics entered the room and asked why such a beautiful girl was crying. HRJ told him that she had just found out that she was definitely not going to be able to attend Louisiana State University that year because of her back injuries. The doctor then examined her old and new x-rays and proceeded to inform the medical residents and plaintiffs that, although the residents' conclusions were correct and surgery would be necessary for an older patient, because of HRJ's young age and the fact that the recent x-rays showed some improvement, wearing the brace would suffice for the moment. He told plaintiffs that they would monitor HRJ's condition, postponing surgery for the time being, and that she should get enrolled again at Louisiana State University.

112. This was the first time that HRJ felt true joy since the accident. Both Marlene Jáquez and her daughter cried with excitement and thanked the doctors. HRJ was instructed to be careful with physical activity and to continue her swimming exercises.

113. With these news, plaintiffs quickly communicated with the administration of Louisiana State University, and HRJ's acceptance was reinstated. On August 18, 2013 they traveled to Louisiana, where HRJ was about to start her college classes.

114.   Amado Ravelo and Marlene Jáquez stayed in Louisiana for a week with their daughter, worried about leaving her alone and far away from them, so soon after her accident.

115.   Since she started classes at Louisiana State University in August 2013, HRJ wore her back brace every day for two more months, which made her feel uncomfortable.

116.   During those first three months after the accident, HRJ was self-conscious and insecure because of her pain and the way she felt with her short hair and having to wear her back brace at all times.   HRJ was later able to start wearing her brace only when she was in her room.

117.   All through her first semester at school, HRJ still suffered from back pain, especially on rainy or cold days.   She could not dance or lift weights like she used to do before the accident; she couldn't cheer or watch the college's football games because the seats at the stadium were uncomfortable and lacked back support.   She couldn't even do something so trivial to many: carry her school backpack and laundry items.   The presence of a car still made her very nervous.

118.   Visits to the student health center were common for HRJ.   At one time, her back pain was so strong that she had x-rays performed at the university's facilities, but they could not compare these new x-rays because HRJ's previous x-rays were in Puerto Rico.

119.   HRJ was so self-conscious and sad that she had a difficult time making friends.   In fact, the first friend she made at LSU was made through her parents.   During the first year after her accident, HRJ lost an average of 10 pounds.   She has also shrunk one inch in height.   She has been instructed by her doctors not to gain any weight because it would strain her spine.

120.   During her holiday vacations, HRJ traveled to Puerto Rico.  While here, her parents took her to have more x-rays performed and attended various doctors' appointments.  They were told during these visits that HRJ might not need surgery after all, and that her injuries had not worsened. New x-rays were taken on December 20, 2013 at the Imaging Center.  These tests' results showed "an anterior compression fracture at L1; almost 75% of the vertebral body height has been lost."

121.   Ever since her accident, HRJ has been unable to participate in as many activities she used to.  For example, her parents owned a timeshare in Disney World and, because of her injury, she cannot ride roller coasters.  She will never again be able to go horseback riding.  She got a job as a waitress and needed someone else to run her food orders if they were too heavy.  She cannot move furniture or heavy objects.  She cannot participate in sporting activities.  She can no longer do sit-ups.  She was informed by her doctors that, if she were to get pregnant, she would have to watch her weight and possibly wear a special back brace.

122.   Her father had always wanted her to consider joining the ROTC and now, because of her injury, that would be out of the question.

123.   Everyday activities in her life have also been affected.  HRJ cannot stay in the same position for too long, which makes air travel, long car rides, and other such activities, painful. Also, she used to wear high heeled shoes and can only wear them now for short periods of time; she cannot dance or walk long distances with them as she used to.  Her physicians have advised her against wearing high heels for long periods of time.

124.   HRJ cannot dance as she used to, even if she wears flat shoes.  She cannot mop or carry a bucket full of water, and cannot fully participate in helping her college roommates in cleaning their dorm room.  To be able to reach high places with her

hands, she needs to extend both arms at the same time, since she is now unable to extend each arm individually.

125. Because her injury was sustained while riding as a backseat passenger in a moving vehicle, HRJ developed a fear of being inside a car.  She got her drivers' license after the accident and feels safer while driving herself rather than when someone else is driving.  She gets anxious when riding as a passenger, and feels that she bothers everyone else when she loses her composure while someone else is driving.

126. The scars in HRJ's head, where she had to be sutured after the accident, have left her with two bald spots in her scalp that she feels very self-conscious of, and many times made her feel depressed.  In order to disguise her scars, she must part her hair in a particular way.

127. HRJ does not feel she is as happy as she was before the accident, and she acknowledges that there are many of life's pleasures that she will not be able to fully enjoy because of the injuries she sustained.

128. HRJ's parents, Mrs. Marlene Jáquez and Mr. Amado Ravelo, were deeply affected by their daughter's accident.  They both describe the night of the accident as the worst night of their lives.

129. Mrs. Marlene Jáquez's condition of Systemic Lupus Erythematosus, which had been under control up until that time, worsened after her daughter's accident.  Her worsened condition required her to begin taking medication again, such as Medrol and Plaquenil.

130. Plaintiffs' expert on permanent physical damages, Dr. Boris Rojas, established in his Expert Report that HRJ's "physical and neurological traumatic impairments will interfere and produce limitations in her physical and neurological functional

capacity."   He stated that HRJ's whole person impairment was 18%, with 15% physical impairment and 3% neurological impairment.

131. In their expert reports for permanent physical damages, Dr. José R. Carlo, defendants/third party plaintiffs' expert, and Dr. José López Reymundí, third party defendants' expert, respectively concluded that HRJ's whole person impairment was 11% and 10%.  Notwithstanding, plaintiffs' expert reviewed said expert reports and reiterated his conclusion that HRJ's permanent whole person impairment is 18%.

132. Regarding HRJ's emotional condition after the accident, Dr. Víctor Lladó, plaintiffs' expert on emotional damages, stated in his report that HRJ has traits of post-traumatic stress disorder, which is in remission and of post-traumatic origin; as well as a major depressive disorder that was severe in the past, but was moderate at the time of his evaluation.

133. Dr. Haydée Costas, third party defendants' expert on emotional damages, stated in her report that HRJ developed symptoms of depression and post traumatic symptoms after the accident, which, according to her have diminished.  She diagnosed HRJ with Adjustment Disorder as a result of the accident.  She stated in her report that HRJ's 'reactive depression' and post traumatic symptoms were part of the Adjustment Disorder.

134. Regarding Mrs. Marlene Jáquez's emotional condition after the accident, Dr. Víctor Lladó, plaintiffs' expert, stated in his report that he had diagnosed her with "depressive disorder with traits of major depressive condition; with significant anxiety component; of posttraumatic origin; severe in the past; moderate at present."

135.   On the other hand, Dr. Haydée Costas, third party defendants' expert on emotional damages, concluded that Mrs. Marlene Jáquez presented anxiety symptoms that were exclusively associated with HRJ's condition after the accident.   She diagnosed Mrs. Marlene Jáquez with an Adjustment Disorder with anxiety.   Dr. Ramón Fortuño, defendants/third party plaintiffs' expert, did not evaluate Mrs. Marlene Jáquez, although she was available for it and had separated the time for her evaluation by him.

## CAUSES OF ACTION

136.   Plaintiffs re-allege each and every allegation stated in the preceding paragraphs as if fully set forth herein.

137.   Pursuant to the laws of Puerto Rico, a person who by negligence or fault causes damages to another person must repair the damage he has caused. Puerto Rico Civil Code, Art. 1802, Title 31 L.P.R.A. § 5141.

138.   In order for a torts cause of action to prosper, three elements must concur: 1) damages; 2) a wrongful or negligent act or omission; and 3) a connection between the damages suffered and the wrongful or negligent act or omission.   *Blas v. Hospital Guadalupe*, 146 DPR 267, 322 (1998).

139.   "The obligation imposed by § 5141 of this title is demandable, not only for personal acts and omissions, but also for those of the persons for whom they should be responsible.   The father, and, in the event of his death or incapacitation, the mother, is liable for the damage caused by the minor children living with them." Puerto Rico Civil Code, Art. 1803, Title 31 L.P.R.A. § 5142.

140.   "Guardians are liable for the damages caused by minors or incapacitated persons who are under their authority and live with them." Id.

141. Parents are responsible for the damages caused by the minor children living with them. López v. Porrata Doria, 156 DPR 503 (203).

142. The liability of the parents arising from Art. 1804 is of a primary nature as it is based on the fault or negligence of the parents themselves, rather than on that of the children. Álvarez v. Irizarry, 80 P.R.R. 60 (1957); Cruz v. Rivera, 73 P.R.R. 632 (1952).

143. This violent car crash and the damages suffered by Plaintiffs were directly caused by the negligent acts of Valeria Di Gregorio. Defendant Valeria Di Gregorio drove the vehicle over the legal speed limit in a reckless manner and, upon information and belief, under the influence of alcohol. This conduct reflects clear scorn towards the safety of persons in other cars and of the passengers that were in the car with her. These actions were in clear violation of Puerto Rico's laws and caused a collision that could have been fatal.

144. Defendant Ernesto Di Gregorio, as Valeria Di Gregorio's father and with whom she lived with at the time of the accident, is vicariously responsible for any wrongful or negligent damages caused by his daughter. Because Ernesto Di Gregorio was married to Michelle Martínez Soldevilla as of June 26, 2013, were Ernesto Di Gregorio to be economically insolvent, the Conjugal Partnership existing between them would also be liable.

145. Defendant Ecolift Corporation, as owner of the Yaris, is liable for the damages caused by its automobile. Defendant Ernesto Di Gregorio, as owner of Ecolift Corporation, allowed his daughter Valeria Di Gregorio to use the car.

146. **A, B and/or C Insurance Companies**, as the insurance companies who, upon information and belief, provide liability coverage for the car, are solidarily liable to plaintiffs for damages caused by the insured car.

147. **Insurance Companies F, G and/or H**, as other insurance companies may provide liability coverage that makes them liable for facts similar to the ones described in this Complaint.

148. **James, Jane and Johnson Doe** are individuals who may be liable for the occurrence of this accident.

149. Defendants have made no good faith effort to repair the damages suffered by Plaintiffs, which are known to them.

150. Defendants are also liable to Plaintiffs for a reasonable value of attorney's fees, costs and expenses of this legal action and Plaintiffs are entitled to prejudgment interest.

## DAMAGES

151. Plaintiffs re-allege each and every allegation stated in the preceding paragraphs as if fully set forth herein.

152. As a direct result of the actions and/or omissions of Defendants, Plaintiff HRJ has suffered physical and emotional damages, and continues to suffer from them today.  She suffered a compression fracture to her spine because of the accident. To this day, HRJ still suffers from limited mobility because of the accident.  She has to deal with these limitations every day.  She still feels afraid when she rides in a car; whenever a car stops she gets nervous; and she will never be able to ride roller coasters, for example, because their speed and flips are, not only dangerous to her back condition, but also remind her of the traumatic experience of the accident. She also fears guilty for all of the grief the accident has caused her family.  At such a young age, she worries about the possible complications her condition could cause if she were to get pregnant in the future.

153.   HRJ's damages are valued at no less than $800,000.00.

154.   As a direct result of the actions and/or omissions of Defendants, Marlene Jaquez spent the night of June 16, 2013 worrying and trying to find the hospital where her daughter would be taken to.  She had to spend 10 days in Centro Médico staying next to her daughter at all times, sleeping on the floor and in cold hospital conditions that further affected her Systemic Lupus Erythematosus, a debilitating autoimmune disease which she had been diagnosed with 25 years before her daughter's accident.   The stress produced by the accident threatened to destabilize her condition, which she had been able to stabilize by, among other things, avoiding stressful situations.  She had to visit her doctors' office even more because she has not been able to recuperate completely, physically or mentally. Also, she had to take care of her daughter, staying with her at all times for a month and a half after she was released from Centro Médico.  Spending nights alone is extremely difficult for her since she always worries that she will receive another phone call about her daughter, and she is always afraid when HRJ rides in a car. Since the day of the accident she worries constantly about her daughter's safety and health, and the still unknown consequences of the accident.  The stress and anguish provoked by her daughter's accident has triggered her Systemic Lupus Erythematosus symptoms, and the fact that she can't sleep well at night has also worsened her symptoms.

155.   Marlene Jaquez's damages are valued at no less than $300,000.00.

156.   As a direct result of the actions and/or omissions of Defendants, Amado Ravelo, who has worked in the military and as a police officer, among other extremely dangerous jobs, never experienced a fear as great as the night of June 26, 2013. He spent the night looking for his daughter, not knowing the extent of her injuries or

where she was.  He spent 10 days in Centro Médico with his wife and daughter. Because of the condition in which his daughter was left after the accident, he worries about her constantly, not knowing still the full consequences of the accident on her daughter and family.

157.   Amado Ravelo's damages are valued at no less than $200,000.00.

## DEMAND FOR JURY TRIAL

158.   Plaintiffs demand a trial by jury as to all claims and issues alleged herein.

**WHEREFORE** the Plaintiffs, request and pray that the Honorable Court will grant the instant Complaint in all respects and judgment entered in their favor awarding them the damages currently estimated in an amount no less than **$1,300,000.00** as well as the costs of this action, together with prevailing interest and reasonable attorneys' fees for obstinacy and such other equitable relief as the Court may deem just and proper.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico this 21st day of July, 2016.

**S/Dennis A. Simonpietri Monefeldt**

**DENNIS A. SIMONPIETRI MONEFELDT**
**USDCPR No. 117913**
16-A Regina Medina St.
Santa Paula
Guaynabo, P.R. 00969
Tel. 787.731-5001/ 790-4898
Fax 787.731-5001
Email: dennis.simonpietri@gmail.com

**S/Carolina Villafañe Escudero**

**CAROLINA VILLAFAÑE ESCUDERO**
**USDCPR No. 302904**
2005 Flamboyán St.
Urb. Monteflores
San Juan, PR 00915
Tel. 787.948.9877
Fax 787.731.5001
Email: cve.law@gmail.com